[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
Twenty months after their last placement in foster homes, Michael, Charles, Jonathan and William B., children born out of wedlock to Carolyn L., became subjects of these petitions filed in this court on 9/9/94, through which the Department of Children and Families (DCF) seeks to terminate her parental rights as well as those of David B., whom blood testing has eliminated as the biological father of Jonathan but who has been accorded standing as the father of the other three children. DCF alleges, as to both parents, all four of the nonconsensual grounds for granting such termination as set forth in subsection (b) of Sec. 17a-112 of the Conn. Gen. Stats (Rev. 1993) applicable to children, such as these, previously committed to the Commissioner of DCF as neglected or uncared for pursuant to Sec. 46b-129, subsection (d).
Both parents appeared with separate counsel at the initial hearing on these petitions on 10/12/94 when service was confirmed and denials entered as to all of the grounds pleaded. The petitioner's oral motion for psychological evaluations of the family was denied without prejudice to being renewed at a time more proximate to the actual trial date. Four months later the motion was renewed and again denied, but on motion of the children's counsel, David B. was ordered to submit to paternity testing with regard to Jonathan. In April, six months after the petitions were filed, the state's motion for clinical evaluations was granted and a tentative trial date set for 5/17/95. This date was continued at the request of the petitioner, and four trial dates certain in June of 1995 were set. For reasons which do not appear of record, all of these dates were canceled. By mid-August, paternity testing had still not been accomplished, the father having failed to keep two previously scheduled appointments. On 8/6/95, the court again ordered the testing to be done, and by the end of September, 1995 — more than a year after the initiation of these petitions — David B. had been eliminated as the father of Jonathan, leaving that child with CT Page 1814 only one known parent. No question was raised by any party as to David's paternity of the other three children.
Evidence was offered at four days of trial concluding on 1/25/96 with the parties given until 2/23/96 for the filing of trial memoranda. The adjudicatory date is thus, in the absence of any amendment filed to the original petitions, 9/9/94, the original date of filing. (Practice Book Sec. 1042.1, subsection (4).) Facts occurring to the final day of trial may be considered for disposition. (Id., Section 1043.1, subsection (1).) The period of reserved decision commences on 2/23/96, the date trial memoranda were received.
Facts — as of 9/9/94
1. Prior to commitment on 4/22/93:
Carolyn L. had no known problem with substance abuse until, divorced and childless in her mid-twenties, she met and began a sustained relationship with David B. By her own admission, she has abused drugs throughout her childbearing years while living off and on with David B. (State's Exh. O, pages 4 and 6.) Michael was born on 3/31/86 and Charles 19 months later on 10/23/87. Although paternity testing has eliminated David as the biological father of Jonathan, born 12/3/90, the family has regarded him as such until September of 1995 when the blood testing ordered by the court in April of 1995 was finally accomplished. William, born 8/8/92, has spent all but four of his first five months of life in foster care.
DCF began receiving referrals on these children shortly before William's birth. In March of 1992 a referral was received when both parents were arrested for possession of narcotics and drug paraphernalia. Three months later Michael and Charles, both children with special needs, were referred for medical neglect. A month after William was born with both cocaine and alcohol in his system, the father was again arrested and the mother gave DCF voluntary permission to place the children while she entered and completed a 30-day inpatient drug program. The children were returned to her care at her request in October of 1992, but subsequent urine screens disclosed her resumption of cocaine abuse. All four children were removed involuntarily on 1/19/93 when Carolyn failed to retrieve the baby from the care of a baby-sitter, and when police went to the home to check on the safety of the other three children they found an inadequate caretaker CT Page 1815 who appeared to be under the influence of drugs or alcohol. Neglect petitions were filed and on 4/22/93 both parents appeared in court, represented by separate counsel, and admitted to the allegations of neglect and to the commitment of the children for an initial period of 18 months. They also agreed to expectations articulated by the court, designed to facilitate reunification of this family. (State's Exh. R.) These included keeping their whereabouts known to DCF: visitation as permitted by DCF; participation in substance abuse assessment and recommended treatment; the securing of a stable and adequate living situation; the avoidance of substance abuse and of any further violation of the criminal laws.
2. From commitment (4/22/93) to adjudicatory date (9/9/94)
Neither parent appeared at reviews in court called in June and September of 1993 for the purpose of ensuring compliance with these expectation. It was later learned that the mother had been rearrested on June 9, 1993 and, after serving six months was released for less than six months when she was again arrested for violating parole and continued drug use and returned to Niantic. (State's Exh. O, p. 7.) She was released in July of 1994 and was residing at a homeless shelter in Middletown when these petitions were filed.
David is learning disabled (Id., p. 8) and told the DCF social worker that he is unable to read. (Testimony of Ms. Zavetsky.) His drug involvement, by his own report, resulted in a sporadic employment history. (State's Exh. O, p. 8.) Like Carolyn, he, too, was rearrested in May of 1994 and remained incarcerated to the time of the institution of these actions.
The efforts of DCF to facilitate visitation with parents who were intermittently incarcerated, who did not report every one of their frequent changes of residence, and who usually were unreachable by telephone, were nothing short of heroic. (State Exh. P and Q.) In the sixteen and one-half months between the date of commitment and the adjudicatory date herein, Carolyn visited her oldest son, Michael, eight times; Charles seven times, William eight times. The last visit with these three boys was on 3/25/94. The father had Michael and Charles brought to jail to visit him in June and September of 1993 and canceled a visit scheduled for 11/1/93. Although an administrative decision has been made in November of 1993 to stop these visits because of the detrimental effect upon both boys, David was permitted to CT Page 1816 visit all four boys with Carolyn on the last visit she had on 3/25/94. Both parents were scheduled to visit the boys again in early April of 1994 but neither came nor called. Meetings at DCF scheduled for 4/27/94 and 5/4/94 for the purpose of executing service agreements containing a regular visitation schedule for both parents were not attended by either parent, and both were reincarcerated later in May. Noteworthy is the fact that for both parents, the only time when visitation with any of the children occurred with any regularity is when the parents were incarcerated and the children brought by DCF to see them. When the parents were released, visitation became sporadic. unpredictable and infrequent.
Each of these boys has special needs but the older two, who had spent most of their lives with the respondent parents, have severe disabilities requiring an extraordinary degree of special care.
Adjudication — on facts as of 9/9/94
1. Acts of omission or commission: One of the pleaded nonconsensual grounds for terminating the rights of both parents must be dismissed at the outset. The petitioner has offered no proof that any of these children has, since January of 1993, been denied any necessary care, guidance or control by these parents. While the clinical condition of the two older boys suggests that the chaotic lifestyle experienced before that date while in the care of their parents might have contributed significantly to their present diagnosis of post traumatic stress syndrome (testimony of Dr. Walsh), the fact that their first foster home had to be changed after the adjudicatory date and that both boys were psychiatrically hospitalized thereafter makes it impossible to ascribe causation for that diagnosis to the circumstances in the parental, as opposed to the foster, home. That ground, therefore, as to both parents, is dismissed.
Petitioner has, however, provided clear and convincing proof that one or more other pleaded grounds exists for terminating the parental rights of each of these parents based upon facts as of the adjudicatory date:
2. Failure to rehabilitate: This record is devoid of any evidence that Carolyn has even begun the difficult process of rehabilitating from her longstanding drug addiction, and the only evidence that David had begun such process was his own CT Page 1817 uncorroborated testimony. Even accepting his testimony as fully credible, his six months of sobriety only began long after the adjudicatory date and hence is of dispositional significance only. The continuing drug abuse by both parents throughout the sixteen months of the children's commitment to DCF prior to the institution of this action produced the resulting continuation of their earlier problems of incarceration, homelessness and unemployment. Neither had a home to which these children could be brought to live, and neither had been able to maintain more than token contact with the children, nearly all visits before the last (3/25/94) occurring only when the DCF social worker transported the children to where each parent was incarcerated. When the parents were on their own, they kept one visit in March of 1994 and then proceeded to miss the next scheduled visit and two subsequently scheduled appointments at DCF set for the purpose of reestablishing a visitation schedule. Despite their expressed feelings for these children, they have been unable to effect sufficient change during 20 months of their children's foster placements, to encourage the belief that within areasonable time, considering the age and needs of . . . [each]child, such parent[s] could assume a responsible position in thelife of the child[ren] within the meaning of Sec. 17a-112(b), (2).
3. Abandonment has also been clearly established as far as the father's parental rights in William. This child was placed at the age of five months and in the twenty months following, his father saw him a single time, on 3/25/94, failing to keep a subsequently scheduled visit and two appointments with DCF set for the purpose of scheduling further visits. This clearly constitutes abandonment even under the common-law definition which is far more rigid than the definition found in Sec. 17a-112(b)(1):
 . . . the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
As to the older children, it is significant that all but one visit took place when these parents were both incarcerated with the social worker transporting the boys to their parents's places of incarceration. After a single post-incarceration visit on 3/25/94, no further visits were requested until after the institution of these actions to terminate their parental rights. While this may not be regarded as a common-law abandonment, it falls well within the definition of abandonment under the CT Page 1818 applicable statute. It is therefore found that this ground exists to terminate the parental rights of Carolyn in all four of these children and of David in the three of whom he is the father.
4. Absence of parent-child relationship and detriment to thechildren of permitting more time to pass in an effort toreestablish such relationship. It is not surprising that William does not perceive either respondent as his parent, having been placed when he was only five months old and having had so few encounters with them in the twenty months that followed. While the Appellate Court has held that this ground cannot be found with regard to a child removed from parental care, even for good cause (In Re Kelly S., 29 Conn. 600 (1992), the Supreme Court has repeatedly held that this ground has validity, even for committed children (for whom it was originally intended), where the child has positive feelings for, or memories of, the parent. In ReJessica M., 219 Conn. 459 (1991). Such feelings can be promoted and nurtured, even with a child placed out of the home, when visits are kept regularly over a long period of time, as inJessica, supra. But these parents did not maintain even that degree of contact with their younger son. It is, therefore, concluded that as to both parents, with regard to William
 there is no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
Because Carolyn's visits with Jonathan were stopped for therapeutic reasons during this period and because both Michael and Charles appear to their therapist, Dr. Edgar, to have positive feelings for the parents, this ground is dismissed as to these three boys for both respondent parents.
Disposition — on facts as of 1/25/96
David made his first progress on combating a seven-year drug problem within the six months preceding the final trial date. At the time of testifying on 1/25/96, he acknowledged that he was not ready to assume responsibility for the care of any of these children but did not want to stop being able to visit them. On CT Page 1819 the final trial date, he was living in a shelter and attending 12-step meetings daily.
The mother, who elected not to testify on her own behalf, called a witness from Shepherd Home, a Middletown shelter that offers opportunities for counseling, including for substance abuse, to homeless adults. His testimony was less than persuasive since he had not seen Carolyn since she left the shelter in November of 1994, fourteen months before the dispositional date. He testified that during her three and one-half months in the shelter, Carolyn had shown "some willingness" to seek substance abuse counseling, although she did not attend the 12-step program meetings as often as recommended. She showed a great reluctance, however, to attend supplementary outpatient aftercare counseling which he regarded as essential to recovery and had strongly recommended to her, giving a variety of noncompelling reasons for her failure to do so. Carolyn left the Shepherd Home in November of 1994, giving as her reason that she had "gotten all she could" out of that program. One of the things she did take from the program was a relationship with a James P., also a drug addict, whom she had met, or reencountered, while at the shelter and by whom she gave birth to a fifth child in mid-July of 1995. No evidence was offered as to her involvement in any other drug treatment program as of the final trial date. Her last known residence was a one-bedroom apartment which she shared with another woman and her child, her relationship with James P. having ended as abruptly as it had begun.
Even if the four children in question were emotionally stable and developmentally average, neither of these parents is in a condition to resume their care in the foreseeable future. David has certainly taken the first major step toward getting his life under control by maintaining sobriety and avoiding further criminal activity, but by his own admission he is not yet able to assume full care of any child and cannot foresee when he will be able to do so. Carolyn offered no evidence that her longstanding drug problem is being addressed, and will have to show a marked improvement in her ability to parent if she hopes to keep custody of the baby born to her during the pendency of this action. But these four children are not stable or average. Michael and Charles, who spent their earliest years in the care of these parents, are severely damaged and will present a major challenge even to specially trained parents. (Testimony of Drs. Walsh and Edgar; state's exhibit O, pp. 8-14; exhibits A and B.) While visits with their father do not appear harmful to them, such CT Page 1820 visits would be counter indicated if they suggested to the children any possible return to the care of either parent. DCF feels even these boys are adoptable and, if an adoptive home cannot be found for them, holding out the possibility of return to a parent who does not appear to be a viable future full-time caretaker can only have detrimental effects of the children. Jonathan, who was two years old when removed from parental care, is intellectually normal and stabilizing emotionally, though displaying disturbed behaviors after visits with his mother. (State's exh. C.) William, removed at five months, ". . . is so attached to his foster mother that separation from her, at this time, would be extremely traumatic." (State's exh. D, p. 3.) Jonathan and William are strongly bonded to each other and to their present foster parents who would be willing to adopt them if they are freed for adoption through this action. Neither has any relationship with Carolyn, nor does William with David, and the prospect for either parent being able to assume their care in the foreseeable future is dim or nonexistent. The unrefuted testimony of the only clinical witness who evaluated these younger boys was unequivocal in recommending adoption for them both.
In summary, whatever positive changes may have taken place in the situation of these parents in the 16 months between the adjudicatory and dispositional dates, they are not sufficient to support a belief that either parent will be able to assume a parental role in the life of any of the children. Dr. Walsh did not see sufficient improvement in the mother's functioning between March of 1994 and April of 1995 to predict when or if he would be able to regain custody of her children, recommending that this not even be considered until she has demonstrated a full year of responsible, drug-free functioning outside of institutions and without external monitoring. (States exh. E,) David did not keep a follow-up appointment with Dr. Walsh in 1995, but by his own self-estimate he could not predict when, if ever, he could care for his children.
Before this court may order termination of parental rights, however, it must consider the seven factors set forth in subsection (d) of Sec. 17a-112:
1. Services offered: DCF made numerous referrals to drug treatment services for both parents. Without the elimination of their drug addiction as the principal impediment to parenting, no other services could be provided. CT Page 1821
2. Reasonable efforts to reunite: DCF has made every reasonable effort to reunite this family. Even after clinicians had recommended that visits be suspended because of their detrimental effect on the children, visits were reinstated. The final cessation of visits occurred in the spring of 1994, not because of agency suspension of the privilege but because the parents, no longer serving sentences, simply stopped visiting until after these petitions were filed.
3. Court orders: While no orders were imposed in this case, the expectations of the court spelled out in April of 1993 at the time of commitment have been unfulfilled: David, still living in shelters, is making an eleventh-hour effort to maintain sobriety but recognizes that while he enjoys visiting his two older sons, he is not far enough along on the road to his own recovery to foresee when he might be ready to care for them. He does not visit nor does he even speak of caring for William. Carolyn is in no known drug treatment, has given birth to a child by a different father from whom she is now separated, and is living in an apartment which lacks space for the addition of any other child. Neither of them were able to avoid further involvement with the criminal justice system or with substance abuse. Neither kept their whereabouts known at all times to the agency responsible for the custody of their children.
4. Feelings and emotional ties with parents or other caretakers:
Michael and Charles appear to remember their father and enjoy visits with him. (Testimony of Dr. Edgar.) While Dr. Edgar had not yet evaluated the advisability of Carolyn's resuming visitation with these older boys by the final trial date, there was no evidence that they did not recognize her or remember living with her. They have, however, evidenced in the past negative responses to parental contacts severe enough to warrant clinical recommendations for the suspension of visits. These two boys have had psychiatric hospitalizations and clinical treatment for their disturbed and developmentally delayed conditions, but DCF is optimistic that adoption is still a possibility for them. Further, the clinical evidence in this case is clear that to hold out even the possibility of an eventual return to the care of these parents when such an outcome is not a realistic probability can only have a detrimental effect. Jonathan and William show little or no connection with their parents and a very strong bond with the present foster parents who are willing to make them a permanent part of their family. CT Page 1822
5. Ages of the children: Michael was two months short of his tenth birthday on the dispositional date, having spent his first nearly seven years with these parents. Charles was over eight years old on that date. Both of these boys are seriously delayed and disturbed and need an end to uncertainty of caretaking before they get into the more disturbing turmoil of adolescence. Jonathan, two when removed from his parents, is now of kindergarten age, and needs the security of a permanent home before embarking on full-time school with the independence required of school aged children. William, now nearly three and one-half, was five months old when last cared for his parents. He is thriving in a nurturing foster home that could be permanent for him, as well as for his brother, Jonathan, before he even reaches kindergarten age.
6. Efforts to rehabilitate: Both parents have made sporadic attempts to visit and to address their multiple problems of drug addiction, homelessness, and criminal activity but, except for the father's recent unsubstantiated sobriety, with apparent permanent lasting results to date. Carolyn, instead of concentrating her resources on securing the return of the children at issue, has given birth to a fifth child whose father is no longer part of her menage. Neither parent came close to exercising the full extent of visitation rights that would have been accorded them by DCF and both have been whereabouts unknown to the agency for extended periods of time during the three years between the children's placement in January of 1993 and the dispositional date in January of 1996.
7. Impediments to maintaining meaningful relationships: Nothing prevented either parent from maintaining meaningful relationships with these children except for their own problems with drug addiction and its attendant difficulties. The suspension of visitation imposed by DCF, on occasion, with regard to the three older children was, in every instance, at the recommendation of clinical experts and therefore not unreasonable. While the parents are chronically unemployed, each has a past history of employment, and economic circumstances have not been offered as a reason for the problems that have plagued this family and ultimately caused its splintering.
Judgment
Having considered the seven factors above, and having found
CT Page 1823 one or more grounds for terminating the parental rights of both parents, it is further found by clear and convincing evidence provided by Dr. Walsh's clinical evaluations conducted over a two year period, supported by Dr. Edgar's recommendations after having clinically treated the two older boys, that it is in the best interests of each of the four children for their parents' rights to be terminated so that they may be freed for the permanent security of adoptive homes. Such a home is clearly assured for the two younger boys, in all probability in their present foster home. While adoption for the two older and more needy boys is less a certainty, it is, in the opinion of DCF, likely to occur. Even if it should prove impossible to secure adoptive homes for either or both of them, in the opinion of both Dr. Walsh and Dr. Edgar it is essential that even the possibility of return to the home of these parents be firmly and finally ended if they are to achieve the necessary emotional security to be able to maximize their limited potentials. Until adoptive homes are found, visitation with either or both parents may continue, not for the purpose of any further effort at reuniting this family but purely as determined by the beneficial effect upon the individual child.
THEREFORE it is ordered that the parental rights of Carolyn L. and David B. in and to their children Michael, Charles, and William B., be, and hereby are, terminated. And further, it is ordered that the parental rights of Carolyn L, sole identified parent of Jonathan B., be and hereby are, terminated. It is further ordered that the Commissioner of DCF be appointed statutory parent for the purpose of securing an adoptive home or other permanent placement, and that such Commissioner shall file with this court, no later than 90 days following the date of this judgment, a written report as to the progress toward such permanent placements. If adoption has not been finalized for any of these children by June 18, 1997, the said Commissioner is further ordered to file a Motion for Review of Plan for Terminated Child for each such child to be heard in this court no later than September 18, 1997.
Entered at Bridgeport this 18th day of March, 1996
Frederica S. Brenneman, Judge